# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| JENNIFER LEIGH HOLT, Individually and as Parent of J.S.H., a minor,<br><br>       Plaintiff,<br><br>vs.<br><br>QUALITY EGG, L.L.C., d/b/a "Wright County Egg," an Iowa limited liability company,<br><br>       Defendant. | No. C 10-3046-MWB<br><br>**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO DISMISS AND STRIKE** |
| DANIEL and LIBBY SANDS, Individually and as Parents of A.S., a minor,<br><br>       Plaintiffs,<br><br>vs.<br><br>QUALITY EGG, L.L.C., d/b/a "Wright County Egg," an Iowa limited liability company,<br><br>       Defendant. | No. C 10-3048-MWB<br><br>**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO DISMISS AND STRIKE** |
| SARAH LEWIS,<br><br>       Plaintiff,<br><br>vs.<br><br>QUALITY EGG, L.L.C., d/b/a "Wright County Egg," an Iowa limited liability company,<br><br>       Defendant. | No. C 10-3050-MWB<br><br>**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO DISMISS AND STRIKE** |

| | |
|---|---|
| TANYA DZINOVIC, | |
| Plaintiff, | No. C 10-3055-MWB |
| vs. | **MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO DISMISS AND STRIKE** |
| QUALITY EGG, L.L.C., d/b/a "Wright County Egg," an Iowa limited liability company, | |
| Defendant. | |
| JIM BUSSEY, | |
| Plaintiff, | No. C 10-3059-MWB |
| vs. | **MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO DISMISS AND STRIKE** |
| QUALITY EGG, L.L.C., d/b/a "Wright County Egg," an Iowa limited liability company, | |
| Defendant. | |
| JASON and JENNIFER TUCKER, Individually and as Parents of J.T., a minor, | |
| Plaintiffs, | No. C 10-3060-MWB |
| vs. | **MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO DISMISS AND STRIKE** |
| QUALITY EGG, L.L.C., d/b/a "Wright County Egg," an Iowa limited liability company, | |
| Defendant. | |

_____

# TABLE OF CONTENTS

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    *A. Applicable Standards* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        *1.*     *Standards for dismissal pursuant to Rule 12(b)(6)* . . . . . . . 12
        *2.*     *Standards for striking allegations pursuant to Rule 12(f)* . . . 14
    *B. Arguments Of The Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        *1.*     *Quality Egg's arguments* . . . . . . . . . . . . . . . . . . . . . 16
        *2.*     *The plaintiffs' responses* . . . . . . . . . . . . . . . . . . . . 18
    *C. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        *1.*     *Standards for punitive damages under Iowa law* . . . . . . . . . 19
        *2.*     *Whether underlying claims must have a "willfulness"*
            *element* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        *3.*     *Whether the regulations and acts underlying the negligence*
            *per se claim permit punitive damages* . . . . . . . . . . . . . . 22
        *4.*     *Whether the punitive damages allegations are related to the*
            *underlying causes of action* . . . . . . . . . . . . . . . . . . . 23

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## I. INTRODUCTION

### A. Procedural Background

These six cases arise out of an outbreak of *Salmonella enteritidis* in the summer of 2010 that was allegedly tied to defendant Quality Egg's products. As of November 18, 2010, the plaintiffs in all six cases asserted claims of strict products liability, negligence, and negligence *per se*; the plaintiffs in five of the cases (excluding *Lewis*, No. C 10-3050-

MWB) asserted claims of breach of warranty; and the plaintiffs in four of the cases (excluding *Holt*, No. C 10-3046-MWB, and *Sands*, No. C 10-3048-MWB) sought punitive damages.[1]

In Rule 12 Motions filed in these cases between November 1, 2010, and November 18, 2010,[2] Quality Egg asked the court to dismiss all breach-of-warranty claims and claims for punitive damages pursuant to Rule 12(b)(6); to strike allegations in support of claims for punitive damages pursuant to Rule 12(f); and to order a more definite statement of all negligence *per se* claims pursuant to Rule 12(e). By Order dated November 18, 2010, on the parties' joint motions, the court consolidated these cases for purposes of discovery. In that Order, the court also noted that counsel for the parties had represented that they had communicated about the issues raised in the pending Rule 12 motions and anticipated that most of the issues could be resolved without court intervention. Therefore, the court granted the parties' request for a schedule for disposition of the pending motions that would allow the parties to work out some issues, clarify others, and get all six cases "up to speed," with the goal that remaining issues could be addressed on one occasion.

The parties' predictions that court intervention ultimately would not be necessary to resolve some of the issues raised in Quality Egg's Rule 12 motions has proved to be correct. Specifically, on December 7, 2010, the plaintiffs filed in each case an Amended (or Second Amended) Complaint (the December 7, 2010, Amended Complaints), and on December 9, 2010, they filed in each case a consolidated Opposition To Defendant's

---

[1] The plaintiffs are all represented by the same counsel.

[2] More specifically, the Rule 12 Motions in question are the following: *Holt*, No. C 10-3046-MWB, docket no. 21; *Sands*, No. C 10-3048-MWB, docket no. 11; *Lewis*, No. C 10-3050-MWB, docket no. 11; *Dzinovic*, No. C 10-3055-MWB, docket no. 11; *Bussey*, No. C 10-3059-MWB, docket no. 8; and *Tucker*, No. C 10-3060-MWB, docket no. 7.

Motion To Dismiss Pursuant To Rule 12(b)(6) And Motion To Strike Pursuant To Rule 12(f). That consolidated Opposition focused on issues relating to punitive damages. In a consolidated Reply To Plaintiffs' Resistance To The Motion To Dismiss Pursuant To Rule 12(b)(6) And Motion To Strike Pursuant To Rule 12(f), filed in each case on December 20, 2010, Quality Egg acknowledges that the December 7, 2010, Amended Complaints no longer assert any breach-of-warranty claims, so that Quality Egg's Rule 12(b)(6) motion to dismiss the warranty claims in the *Holt*, *Sands*, *Bussey*, *Dzinovic*, and *Tucker* cases are now moot, and are withdrawn, and that all of the December 7, 2010, Amended Complaints contain a more specific statement of the plaintiffs' negligence *per se* claims, so that Quality Egg's Rule 12(e) motions for a more definite statement in all cases are withdrawn. Thus, Quality Egg reasserts only its Rule 12(b)(6) motions to dismiss the punitive damages claims and its Rule 12(f) motions to strike specific factual allegations pertaining to punitive damages as to the December 7, 2010, Amended Complaints. Quality Egg's Reply does not assert any additional arguments in support of its position on these remaining issues, however.

The parties did not request oral arguments on the pending Rule 12 Motions in the manner required by applicable local rules. The court also has not found such oral arguments to be necessary, in light of the quality of the parties' briefing and the parties' narrowing of the issues to be resolved by the court. Therefore, the court has considered the Rule 12 Motions on the parties' written submissions.

### B. Factual Background

With this procedural background in mind, the following discussion of the factual background focuses on issues relating to the plaintiffs' claims for punitive damages. "When ruling on a defendant's motion to dismiss, a judge must accept as true all of the

factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). Thus, the factual background presented here is based on the plaintiffs' allegations related to punitive damages in their December 7, 2010, Amended Complaints.

As noted above, these cases arise from an outbreak of *Salmonella enteritidis* in the summer of 2010 that was allegedly tied to defendant Quality Egg's products. In the course of the outbreak, Quality Egg, doing business as Wright County Egg, recalled hundreds of millions of shell eggs that it had manufactured and distributed in recent months. Also, numerous state health departments announced that illnesses among state residents were linked to eggs and egg products sold by Wright County Egg. The plaintiffs allege that, as of October 21, 2010, the Centers for Disease Control (CDC) had linked approximately 1,813 illnesses to egg products contaminated with *Salmonella enteritidis*.

The United States Food and Drug Administration (FDA) Department of Health and Human Services began an investigation into Wright County Egg's egg manufacturing facilities in Galt, Iowa, which included on-site inspections at various egg laying farms/plants between August 12 and August 30, 2010. The FDA's observations from its on-site inspections are contained in FDA Form 483, issued to Wright County Egg's Chief Operating Officer, Peter A. DeCoster, on August 30, 2010. The plaintiffs allege that the FDA Form 483 included the following findings:

> 10.1. Chicken manure located in the manure pits below the egg laying operations was observed to be approximately 4 feet high to 8 feet high at the following locations: Layer 1 – House 1; Layer 3 – Houses 2, 7, 17, and 18. The outside access doors to the manure pits at these locations had been pushed out by the weight of the manure, leaving open access to wildlife or domesticated animals.

10.2. Un-baited, unsealed holes appearing to be rodent burrows located along the second floor baseboards were observed inside Layer 1 – Houses 1-9 and 11-13; Layer 2 – Houses 7 and 11; Layer 3 – Houses 1, 3, 4, 5, and 6; Layer 4 – House 3.

10.3. Dark liquid which appeared to be manure was observed seeping through the concrete foundation to the outside of the laying houses at the following locations: Layer 1 – Houses 1, 2, 3, 4, 5, 8, 11, 12, and 14; and Layer 3 – Houses 1, 8, 13, and 17.

10.4. Standing water approximately 3 inches deep was observed at the southeast corner of the manure pit located inside Layer 1 – House 13.

10.5. Un-caged birds (chickens having escaped) were observed in the egg laying operations in contact with the egg laying birds at Layer 3 – Houses 9 and 16. The un-caged birds were using the manure, which was approximately 8 feet high, to access the egg laying area.

10.6. Layer 3 – House 11, the house entrance door to access both House 11 and 12 was blocked with excessive amounts of manure in the manure pits.

10.7. There were between 2 to 5 live mice observed inside the egg laying Houses 1, 2, 3, 5, 7, 9, 10, 11, and 14.

10.8. Live and dead flies too numerous to count were observed at the following locations inside the egg laying houses: Layer 1 – Houses 3, 4, 6, 8, 9, 11, and 12; Layer 2 – Houses 7 and 11; Layer 3 – Houses 3, 4, 4, 5, 7, 8, 15, 16, 17, and 18. The live flies were on and around egg belts, feed, shell

eggs and walkways in the different sections of each egg laying area. In addition, live and dead maggots too numerous to count were observed on the manure pit floor located in Layer 2 – House 7.

10.9.    [Wright County Egg] did not document washing and disinfecting of [its] dead hen truck and manure equipment prior to moving from farm to farm.

10.10.    [Wright County Egg] did not maintain records documenting the washing and disinfection of the trailers used for the movement of pullets to laying houses.

10.11.    Birds were observed roosting and flying, chicks heard chirping in the storage and milking facilities. In addition, nesting material was observed in the feed mill closed mixing system, ingredient storage and truck filling areas.

10.12.    Outdoor whole kernel corn grain bins 4 and 6 observed to have the topside doors/lids open to the environment and pigeons were observed entering and leaving these openings. Birds were also observed sitting/flying around and over the openings.

10.13.    Samples collected during the course of this inspection and tested by an FDA laboratory revealed the following positive analytical results for *Salmonella enteritidis*:

    10.13.1.    On 8/13/2010, an environmental sample was collected from Layer 2, house 7 manure swab from row 1 - left side.

    10.13.2.    On 8/16/2010, an environmental sample was collected from Layer 2, house 11 at

> manure scraper blade from row 3 - right
> side.
>
> 10.13.3.    On 8/13/2010, an environmental sample
>             was collected from Layer 4, house 3 at
>             walkway 1 - right side and walkway 3 -
>             right side.
>
> 10.13.4.    On 8/14/2010, a sample of meat and bone
>             meal was collected from ingredient bin 7
>             located at [Wright County Egg's] feed
>             mill.
>
> 10.13.5.    On 8/17/2010, a sample of finished feed
>             "Developer" pullet feed was collected
>             from the feed mill.
>
> 10.13.6.    On 8/16/2010, an environmental sample
>             was collected from the roof level covered
>             ingredient bin chute 8; Second Floor
>             ingredient bin cover 19 (ingredient bin 19
>             holds ground corn) located at [Wright
>             County Egg's] feed mill.

December 7, 2010, Amended Complaints, ¶ 10.

In support of their specific claim for punitive damages, the plaintiffs realleged all of the allegations in the preceding paragraphs of their December 7, 2010, Amended Complaints. They then alleged the following:

> 38.    There is clear and convincing evidence that the
> defendant acted willfully and wantonly in disregarding the
> rights and safety of others, including, specifically, the
> plaintiffs. As such, the plaintiffs are entitled to an award of
> punitive damages pursuant to Iowa Code § 668A.1 and Iowa
> law.

39.    At all times relevant hereto, the defendant willfully and wantonly operated its egg production facilities with disregard for the potential contamination of its eggs with bacterial pathogens including, but not limited to, *Salmonella*.

40.    The violations and food safety deficiencies noted by the FDA in its inspection of the defendant's facility, as noted in paragraphs 9 and 10, above, are evidence of the defendant's willful and wanton disregard for the rights and safety [of] those who purchased and consumed its egg products, including the plaintiffs.  The defendant willfully and wantonly operated its plant in a manner where contamination of egg products with *Salmonella* was likely to occur.

41.    Furthermore, the defendant has a long history of wanton and willful disregard for the rights and safety of those who purchase and consume its egg products.  Beginning in 1982, egg production facilities owned and operated by Austin J. DeCoster, owner of Wright County Egg, have been repeatedly linked to outbreaks of *Salmonella* illnesses, including *Salmonella enteritidis* outbreaks.  According to a report in the New York Times, these outbreaks include:

41.1. In 1982, approximately 36 people were sickened, and one person died, in an outbreak of *Salmonella enteritidis* traced to an egg production facility owned and operated by Mr. DeCoster.

41.2. Eggs from the same DeCoster owned facility were suspected as the source of a simultaneous outbreak in Massachusetts that sickened 400 people.

41.3. In 1987, nine people died and roughly 500 were sickened in an outbreak of *Salmonella enteritidis*

in New York City by eggs produced by farms owned and operated by Mr. DeCoster.

41.4. In 1992, eggs from Mr. DeCoster's farm in Maryland were the source of a *Salmonella* outbreak in Connecticut.

42. Numerous state and local regulatory agencies—including New York and Maryland—have either banned, quarantined or otherwise limited the sale of eggs from egg production facilities operated by Mr. DeCoster.

43. Records of environmental sample reports from the defendant's facility in and around Galt Iowa from between 2008 and 2010 indicate that Wright County Egg received 426 positive results for *Salmonella*, including 73 samples that were potentially positive for *Salmonella enteritidis*. The testing included 66 positive samples for *Salmonella* on May 27, 2010 alone. The defendant was aware of the continued presence of *Salmonella*, including *Salmonella enteritidis*, on its grounds, in its equipment, and likely in its egg products, but willfully and wantonly refused to take corrective action.

December 7, 2010, Amended Complaints (paragraph numbers vary; paragraph numbers shown are from *Holt*, No. C 10-3046-MWB, docket no. 26).

## II. LEGAL ANALYSIS

### A. Applicable Standards

Quality Egg continues to assert its motions to dismiss the punitive damages claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and its motions to strike certain allegations in support of the punitive damages claims pursuant to Rule 12(f). Thus, the court's legal analysis begins with a statement of the standards applicable to such motions.

### 1.    Standards for dismissal pursuant to Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for a motion to dismiss on the basis of "failure to state a claim upon which relief can be granted."[3] In a recent decision, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court revisited the standards for determining whether factual allegations are sufficient to survive a Rule 12(b)(6) motion to dismiss:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley v. Gibson,* 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (C.A.7 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see *Papasan v. Allain,* 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-

---

[3] Effective December 1, 2007, Federal Rule of Civil Procedure 12 was "amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules." FED. R. CIV. P. 12, advisory committee's note. The advisory committee notes make it clear that the "changes are to be stylistic only." *Id.* The stylistic changes to Rule 12(b)(6) are in fact minimal, as Rule 12(b)(6) continues to authorize a motion to dismiss "for failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Thus, the recent amendment did not change the standards for a Rule 12(b)(6) motion.

236 (3d ed.2004) (hereinafter Wright & Miller) ("[T]he
pleading must contain something more . . . than . . . a
statement of facts that merely creates a suspicion [of] a legally
cognizable right of action"), on the ASSUMPTION THAT
ALL THE allegations in the complaint are true (even if
doubtful in fact), see, *e.g.*, *Swierkiewicz v. Sorema N.A.,* 534
U.S. 506, 508, n. 1, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002);
*Neitzke v. Williams,* 490 U.S. 319, 327, 109 S. Ct. 1827, 104
L. Ed. 2d 338 (1989) ("Rule 12(b)(6) does not
countenance . . . dismissals based on a judge's disbelief of a
complaint's factual allegations"); *Scheuer v. Rhodes,* 416 U.S.
232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974) (a well-
pleaded complaint may proceed even if it appears "that a
recovery is very remote and unlikely").

*Bell Atlantic*, 550 U.S. at 555-56 (footnote omitted); *see Ashcroft v. Iqbal*, 129 S. Ct.
1937, 1949 (2009) (instructing that "short and plain statement" requirement "demands
more than an unadorned, the-defendant-unlawfully-harmed me accusation."). Thus, the
Eighth Circuit Court of Appeals has recognized that, under *Bell Atlantic*, "To survive a
motion to dismiss, a complaint must contain factual allegations sufficient 'to raise a right
to relief above the speculative level. . . .'" *Parkhurst v. Tabor*, 569 F.3d 861, 865 (8th
Cir. 2009) (quoting *Bell Atlantic*, 550 U.S. at 555). To put it another way, "the complaint
must allege 'only enough facts to state a claim to relief that is plausible on its face.'" *B&B
Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 387 (8th Cir. 2009) (quoting *Bell
Atlantic*, 550 U.S. at 570); *accord Iqbal*, 129 S. Ct. at 1949 ("Where a complaint pleads
facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line
between possibility and plausibility of entitlement to relief.'") (quoting *Bell Atlantic*, 550
U.S. at 557).

Nevertheless, the court must still "accept as true the plaintiff's well pleaded
allegations." *Parkhurst*, 569 F.3d at 865 (citing *Neitzke v. Williams*, 490 U.S. 319, 326-

27 (1989)); *B&B Hardware, Inc.*, 569 F.3d at 387 ("[W]e 'assume[ ] as true all factual allegations of the complaint'" (quoting *Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007)). The court must also still "construe the complaint liberally in the light most favorable to the plaintiff." *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008) (post-*Bell Atlantic* decision). On the other hand, "[w]here the allegations show on the face of the complaint that there is some insuperable bar to relief, dismissal under Rule 12(b)(6) is [still] appropriate." *Benton v. Merrill Lynch & Co., Inc.*, 524 F.3d 866, 870 (8th Cir. 2008) (citing *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997), for this standard in a discussion of Rule 12(b)(6) standards in light of *Bell Atlantic*).

### 2.   *Standards for striking allegations pursuant to Rule 12(f)*

Rule 12 of the Federal Rules of Civil Procedure also provides for a motion to strike, as follows:

> **(f) Motion to Strike.** The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:
>
> **(1)** on its own; or
>
> **(2)** on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

FED. R. CIV. P. 12(f).[4] In ruling on a Rule 12(f) motion, the court "enjoy[s] liberal discretion," and its ruling is reviewed only for abuse of that discretion. *See BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007); *Nationwide Ins. Co. v.*

---

[4]The language of Rule 12(f) was also "restyled" by the 2007 Amendments, but, again, the changes were intended to be stylistic only. FED. R. CIV. P. 12, advisory committee's note.

*Central Missouri Elec. Coop., Inc.,* 278 F.3d 742, 748 (8th Cir. 2001); *Stanbury Law Firm v. IRS,* 221 F.3d 1059, 1063 (8th Cir. 2000); *Chock v. Northwest Airlines, Inc.,* 113 F.3d 861, 863-64 n. 3 (8th Cir. 1997). The rule embodies this discretion, because it is cast in permissive terms ("the court may act . . .") rather than mandatory terms. FED. R. CIV. P. 12(f); *see also Stanbury,* 221 F.3d at 1063 ("Because the rule is stated in the permissive, however, it has always been understood that the district court enjoys 'liberal discretion' thereunder."). The Eighth Circuit Court of Appeals has also recognized that, "[d]espite this broad discretion . . . striking a party's pleadings is an extreme measure, and, as a result, we have previously held that '[m]otions to strike under Fed. R. Civ. P. 12(f) are viewed with disfavor and are infrequently granted.'" *Stanbury,* 221 F.3d at 1063 (quoting *Lunsford v. United States,* 570 F.2d 221, 229 (8th Cir. 1977), in turn citing 5 Wright & Miller, Federal Practice and Procedure: Civil § 1380 at 783 (1969)); *accord BJC Health Sys.,* 478 F.3d at 917 (citing *Stanbury*). Applying these standards, the Eighth Circuit Court of Appeals has ruled that even matters that are not "strictly relevant" to the principal claim at issue should not necessarily be stricken, if they provide "important context and background" to claims asserted or are relevant to some object of the pleader's suit. *Id.*[5]

---

[5] Similarly, the court should not strike a defense as "legally insufficient" if the defense is either "'sufficient as a matter of law or if it fairly presents a question of law or fact which the court ought to hear.'" *Lunsford v. United States,* 570 F.2d 221, 229 (8th Cir. 1977) (quoting 2A Moore's Federal Practice ¶ 12.21 at 2437 (2d ed.1975)). Therefore, the Eighth Circuit Court of Appeals has been "reluctant to rule" on the sufficiency of a defense that presents either legal or factual uncertainty "without the benefit of a full record." *Id.* On the other hand, the court may properly strike a defense under Rule 12(f) as "legally insufficient," if it is foreclosed by prior controlling decisions or statutes. *See United States v. Dico, Inc.,* 266 F.3d 864, 879-80 (8th Cir. 2001) (the district

(continued...)

## B. Arguments Of The Parties

### 1.    Quality Egg's arguments

Quality Egg argues that punitive damages are improper under the facts alleged and, as a result, the plaintiffs' claims for punitive damages should be dismissed.  Quality Egg argues that none of the allegations of other supposed misconduct at other unidentified egg production facilities purportedly operated by Austin J. DeCoster, the alleged owner of Quality Egg, linked to other *Salmonella* outbreaks, from as long ago as 1982, nor environmental sample reports from as far back as 2008 at the Galt, Iowa, facility can support the plaintiffs' punitive damages claims, because none are related to the incident that allegedly forms the basis of the lawsuit and none relate to or are relevant to the incident at issue or the circumstances surrounding and pertaining to the shell eggs at issue in this litigation.  Quality Egg argues that an award of punitive damages must be based on a finding that the conduct from which the claim arose constituted willful and wanton disregard for the rights and safety of another, but the different, unrelated events, at unrelated facilities, over the last three decades, do not relate to the conduct at issue here. Quality Egg argues that the plaintiffs have not alleged that Quality Egg had any knowledge or had received any positive sample results that its eggs were contaminated with *Salmonella enteritidis*, the exact issue from which the plaintiffs' claims arise.

---

[5](...continued)
court properly struck a due process affirmative defense on the ground that it was foreclosed by a prior decision of the Eighth Circuit Court of Appeals and a subsequent decision of the United States Supreme Court had not undermined the appellate court's decision, as the defendant argued); *United States v. Winnebago Tribe of Nebraska,* 542 F.2d 1002, 1007 (8th Cir. 1976) (a defense was "clearly insufficient" where it was contrary to provisions of the Flood Control Act of 1944).  However, the Rule 12(f) motion here is directed at the plaintiffs' punitive damages claims, not to any defenses.

Quality Egg also argues that none of the facts alleged demonstrate willful and wanton conduct, because there are no allegations of personal spite, hatred, or ill will to establish actual malice, and none that demonstrate wrongful conduct committed with willful and reckless disregard for the rights of others, with respect to the incident that forms the basis of this action, to establish legal malice. Quality Egg points out that there are no allegations that it intentionally inserted *Salmonella* into its eggs with the intent to harm the plaintiffs or knew that there were tainted eggs and ignored that fact.

Quality Egg also argues that punitive damages cannot be awarded as a separate theory of recovery, but must be incidental to and derived from the underlying causes of action. Quality Egg points out that none of the claims asserted by the plaintiffs include willful or wanton conduct as an element of the cause of action. More specifically, as to the strict liability claims, Quality Egg argues that there are no allegations (1) that it was aware of *Salmonella enteritidis* in its egg products; (2) that it was aware that the plaintiffs were being harmed by exposure to the eggs; or (3) that it ignored the situation. As to the negligence *per se* claims, Quality Egg argues that it is unclear whether any of the Iowa health and safety acts or regulations upon which the plaintiffs rely permit the recovery of punitive damages. Finally, as to the negligence claims, Quality Egg argues that it is clear that merely negligent conduct will not support an award of punitive damages.

Turning to its motion to strike, Quality Egg argues that the allegations in the December 7, 2010, Amended Complaints purportedly detailing *Salmonella* outbreaks linked to farms owned by DeCoster from the 1980s and 1990s and the sample reports from the Galt, Iowa, facility from 2008 through 2010 are not related to the incident that forms the basis of this lawsuit and are completely irrelevant to the plaintiffs' causes of action. Again, Quality Egg contends that these allegations involve different and unrelated farms, or different events and circumstances, and do nothing more than improperly and

unnecessarily prejudice Quality Egg and would potentially infuriate the fact finder. Thus, Quality Egg contends that these allegations should be stricken as immaterial or impertinent.

### 2.    *The plaintiffs' responses*

In response, the plaintiffs argue that their allegations in support of punitive damages can be grouped into two basic categories:   (1) those facts concerning Quality Egg's operation of its Galt, Iowa, egg manufacturing and processing facilities in 2010; and (2) those facts concerning prior egg manufacturing and processing practices at numerous facilities also owned by A.J. DeCoster, the owner of Quality Egg.  They contend that the first category of allegations includes numerous deficiencies documented by the FDA in its "Form 483" report from its inspection of Quality Egg's Galt, Iowa, facility in August, 2010, and also references the repeated positive test results for *Salmonella*, including the *Enteritidis* strain implicated in these cases as part of the nationwide *Salmonella* outbreak, beginning in 2008 and continuing through 2010, at Quality Egg's facilities.  They also contend that the second category of allegations represent only the "tip of the iceberg" of Mr. DeCoster's long history, spanning numerous corporate entities, of flaunting regulatory authority and producing egg products repeatedly associated with *Salmonella* outbreaks and illnesses.

The plaintiffs contend that their punitive damages claims are sufficient to survive a Rule 12(b)(6) motion to dismiss, even if they are based only on the first category of allegations.   Specifically, they argue that those allegations show that Quality Egg knowingly operated its Galt, Iowa, egg manufacturing and processing facility over extended periods of time in a manner that created filthy and insanitary conditions, and where pathogen testing repeatedly revealed the presence of *Salmonella*, generally, and *Salmonella enteritidis*, in particular.  They also argue that these allegations show that Quality Egg, a large-scale manufacturer and processor of eggs for human consumption,

was obviously aware that eggs contaminated with *Salmonella* bacteria pose a risk of harm to the public at large. Thus, the plaintiffs contend that these allegations are sufficient to show Quality Egg's willful and wanton disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow. They also argue that the second category of allegations is relevant to punitive damages, because, under Iowa law, punitive damages can be based on a defendant's prior history of willful and wanton conduct.

The plaintiffs also assert that, although punitive damages are not a separate theory of recovery, that does not mean, as Quality Egg contends, that "wanton and willful" conduct must be an element of their underlying causes of action. Rather, they argue that the conduct giving rise to their causes of action must be shown to rise to the level of "wanton and willful" conduct required to support an award of punitive damages. They contend that their allegations are sufficient to show that Quality Egg's conduct met this standard.

Finally, the plaintiffs argue that there is no basis to strike allegations in support of their punitive damages claims pursuant to Rule 12(f), because allegations in both categories are relevant to punitive damages, as argued above. They contend that Quality Egg wants to assert that it was ignorant of any risk of harm to consumers of egg products from the presence of *Salmonella* in its products, then exclude allegations documenting its long history of involvement with eggs contaminated with *Salmonella*.

## C. Analysis

### 1. Standards for punitive damages under Iowa law

IOWA CODE § 668A.1 provides that, to recover punitive damages, a plaintiff must prove "by a preponderance of clear, convincing, and satisfactory evidence, the conduct of

the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another." Punitive damages are not awarded "because a plaintiff deserves them, but as punishment, to deter the defendant and others from repeating *similar outrageous* conduct. . . . The conduct must be egregious." *Schultz v. Security Nat'l Bank*, 583 N.W.2d 886, 888 (Iowa 1998) (internal quotations omitted; emphasis in the original); *Steckelberg v. Randolph,* 448 N.W.2d 458, 462 (Iowa 1989) (stating that punitive damages are available to "'punish the party against whom they are awarded and to deter others from similar wrongdoing'" (quoting *Grefe v. Ross,* 231 N.W.2d 863, 868 (Iowa 1975)).

The Iowa Supreme Court has defined what the terms "willful and wanton" mean in the context of § 668A.1(1), as follows:

> "'[T]he Actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which is usually accompanied by a conscious indifference to the consequences.'"

*Mercer v. Pittway Corp.,* 616 N.W.2d 602, 617 (Iowa 2000) (quoting *Fell v. Kewanee Farm Equip. Co.,* 457 N.W.2d 911, 919 (Iowa 1990), in turn quoting W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 34, at 213 (5th ed.1984)); *accord Cawthorn v. Catholic Health Initiatives Iowa Corp.*, 743 N.W.2d 525, 529 (Iowa 2007) (same); *Wilson v. Vanden Berg,* 687 N.W.2d 575, 586 (Iowa 2004) (same); *Gibson v. ITT Hartford Ins. Co.,* 621 N.W.2d 388, 395 (Iowa 2001) (same); *McClure v. Walgreen Co.,* 613 N.W.2d 225, 230 (Iowa 2000) (same). The Iowa appellate courts have noted that "merely negligent conduct will not, without more, support an award of punitive damages." *Hamilton v. Mercantile Bank of Cedar Rapids,* 621 N.W.2d 401, 407 (Iowa 2001); *see Beeman v. Manville Corp. Asbestos Disease Comp. Fund,* 496 N.W.2d 247, 256 (Iowa 1993). Rather, to establish the requirement of "willful and wanton disregard for the rights

or safety of another," a plaintiff must show that the defendant's conduct constituted actual or legal malice. *Gibson,* 621 N.W.2d at 395; *Schultz v. Security Nat'l Bank,* 583 N.W.2d 886, 888 (Iowa 1998); *McClure,* 613 N.W.2d at 231; *Reed v. Chrysler Corp.,* 494 N.W.2d 224, 229 (Iowa 1992); *Barnhouse v. Hawkeye State Bank,* 406 N.W.2d 181, 184 (Iowa 1987); *Beeck v. Aquaslide 'N' Dive Corp.,* 350 N.W.2d 149, 167 (Iowa 1984). "'Actual malice is characterized by such factors as personal spite, hatred, or ill will.'" *Gibson,* 621 N.W.2d at 395 (quoting *McClure,* 613 N.W.2d at 231); *see Schultz,* 583 N.W.2d at 888; *Parks v. City of Marshalltown,* 440 N.W.2d 377, 379 (Iowa 1989). "'Legal malice is shown by wrongful conduct committed or continued with a willful or reckless disregard for another's rights.'" *Gibson,* 621 N.W.2d at 395 (quoting *McClure,* 613 N.W.2d at 231); *see Schultz,* 583 N.W.2d at 888; *Parks,* 440 N.W.2d at 379.

The statutory burden of proof requires "proof greater than a mere preponderance of the evidence," but something less than proof "beyond a reasonable doubt." *See Niver v. Travelers Indem. Co. of Ill.*, 433 F. Supp. 2d 968, 995-96 (N.D. Iowa 2006). Thus, an award of punitive damages is inappropriate when room exists for reasonable disagreement over the relative risks of the conduct at issue. *Larson v. Great West Casualty Co.,* 482 N.W.2d 170, 174 (Iowa Ct. App. 1992); *Burke v. Deere & Co.,* 6 F.3d 497, 511 (8th Cir. 1993) (applying Iowa law), *cert. denied,* 510 U.S. 1115 (1994).

### 2.    *Whether underlying claims must have a "willfulness" element*

The court must first dispense with the least tenable of Quality Egg's arguments, its contention that, to obtain punitive damages, the underlying claims asserted by the plaintiffs must include willful or wanton conduct as an element of the causes of action. Quality Egg is correct that, some time ago, the Iowa Supreme Court specifically recognized that "[p]unitive damages are merely incidental to the main cause of action." *Campbell v. Van Roekel*, 347 N.W.2d 406, 410 (Iowa 1984) (holding that, consequently, a defendant cannot

assert a separate defense to punitive damages that is not applicable to the underlying cause of action from which the claim for punitive damages is derived). This does not mean, however, that the underlying cause of action must have "willfulness" as an element for a plaintiff to obtain punitive damages on that cause of action. What it does mean is that, to obtain punitive damages, in addition to proving an underlying claim, the plaintiff must also prove that "the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another." IOWA CODE § 668A.1; *see also Gibson,* 621 N.W.2d at 395 (explaining that proof of a claim alone will not establish a right to punitive damages, because to establish the requirement of "willful and wanton disregard for the rights or safety of another" to obtain punitive damages, a plaintiff must also show that the defendant's conduct constituted actual or legal malice); *Hamilton,* 621 N.W.2d at 407 (noting that "merely negligent conduct will not, without more, support an award of punitive damages"). Thus, while the plaintiffs' punitive damages claims fail to state a separate cause of action, they do not fail to state a claim for punitive damages upon which relief can be granted, because the lack of willful and wanton conduct elements in the underlying claims is not an "insuperable bar" to obtaining punitive damages. *Benton,* 524 F.3d at 870 (explaining that a Rule 12(b)(6) motion to dismiss should not be granted unless there is some "insuperable bar" to the relief requested).[6]

### 3. *Whether the regulations and acts underlying the negligence* **per se** *claim permit punitive damages*

In a similar vein, Quality Egg argues that the plaintiffs' claims for punitive damages on their negligence *per se* claims should be dismissed, because it is unclear whether any

---

[6]The court does not address here the question of whether punitive damages can be awarded on a claim of strict products liability under Iowa law. In the court's view, Quality Egg's Rule 12 Motions do not squarely raise this issue.

of the Iowa health and safety acts or regulations upon which the plaintiffs rely permit the recovery of punitive damages. This argument misses the point. Under Iowa law, a failure to comply with a statutory duty is negligence *per se*. *Tim O'Neill Chevrolet, Inc. v. Forristall*, 551 N.W.2d 611, 618 (Iowa 1996). Thus, the question is not whether the regulations or acts on which a negligence *per se* claim is based permit the recovery of punitive damages, but whether Iowa law permits the recovery of punitive damages on a negligence *per se* claim. The defendants have made no argument showing and cited no case law holding that punitive damages cannot be awarded on a negligence *per se* claim, even though punitive damages plainly can be awarded on other negligence claims, where duty and breach of duty must be established by other means. *See McClure v. Walgreen Co.*, 613 N.W.2d 225, 231 (Iowa 2000) (affirming a punitive damage award in a negligence action, noting that the issue was for the jury). Thus, this argument does not warrant dismissal of the punitive damages claim as to any underlying negligence *per se* claim.

### 4. *Whether the punitive damages allegations are related to the underlying causes of action*

Quality Egg is also correct that punitive damages must be based on sufficient proof that "the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another," IOWA CODE § 668A.1, so that punitive damages must be based on evidence that relates to the underlying cause of action. Nevertheless, the scope of evidence that supports punitive damages is not as circumscribed as Quality Egg contends.

For example, punitive damages may be based on "disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow." *Mercer*, 616 N.W.2d at 617 (internal citations omitted). Evidence supporting such a finding

includes "'evidence of [a] defendant's persistent course of conduct to show that the defendant acted with no care and with disregard to the consequences of those acts.'" *Wolf v. Wolf*, 690 N.W.2d 887, 893 (Iowa 2005) (quoting *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co.*, 510 N.W.2d 153, 156 (Iowa 1993)). Allegations that Quality Egg had frequent notice of *Salmonella* problems at its egg manufacturing facility in Galt, Iowa, from 2008 to 2010, but did not remedy those problems (so-called "category one" evidence) do plausibly suggest that Quality Egg engaged in a "persistent course of conduct" showing that it "acted with no care and with disregard of the consequences of those acts" in failing to prevent *Salmonella* contamination of its eggs and egg products, knowing that such products were destined for human consumption, so that there was a known or obvious risk that harm would follow such dereliction. *See B&B Hardware, Inc.*, 569 F.3d at 387 (stating a plausibility standard to survive Rule 12(b)(6), quoting *Bell Atlantic*, 550 U.S. at 570); *accord Iqbal*, 129 S. Ct. at 1949 (also requiring that allegations cross the line between possibility and plausibility); *see also Wolf*, 690 N.W.2d at 893 (stating that evidence of a defendant's persistent conduct to show a defendant's lack of care and disregard of consequences meets the punitive damages standard based on disregard of a known or obvious risk); *McClure*, 613 N.W.2d at 231 (holding that evidence of dozens of incident reports of dispensing errors in a three-year period nearly identical to the error at issue in the case were sufficient to show that a pharmacy had a serious problem and failed to take adequate steps to correct it, justifying punitive damages); *Lovick v. Wil-Rich*, 588 N.W.2d 688, 699 (Iowa 1999) (holding that evidence of conduct prior to the time of the conduct at issue in a negligence claim was properly considered, because the jury was entitled to consider whether the evidence showed that the defendant's failure to take corrective action constituted willful and wanton disregard); *Tratchel v. Essex Group, Inc.*, 452 N.W.2d 171, 176 (Iowa 1990) (holding that evidence that the defendant was aware of

defects allowing gas leakage, from return and analysis of defective equipment, and inspection reports of flaws, and the defendant's knowledge that tools were used by customers to turn binding knobs resulting in broken stems, and the defendant's efforts to keep the magnitude of the problems from the appropriate government agency and its customers was sufficient to show legal malice), *abrogated on other grounds*, *Comes v. Microsoft Corp.*, 775 N.W.2d 302 (Iowa 2009); *McCarthy v. J.P. Cullen & Son Corp.*, 199 N.W.2d 362, 369 (Iowa 1972) (holding that there was substantial evidence that the defendant "knowingly and intentionally persisted in a course of conduct despite repeated protests and complaints of its harmful consequences, thereby disclosing such willful disregard for plaintiffs' rights as to create a jury issue relative to punitive damages").

Quality Egg's contrary arguments notwithstanding, the "category one" allegations are sufficiently close in time and circumstances to the *Salmonella* outbreak in 2010 to inform the jurors about the willfulness and wantonness of the conduct "from which the claim arose." IOWA CODE § 668A.1. Nor are the plaintiffs' "category two" allegations of a long history of associations of egg businesses of Mr. DeCoster, who is allegedly the owner Quality Egg, with *Salmonella* outbreaks necessarily so unrelated to the conduct "from which the claim arose" as to bear no plausible relationship to the question of punitive damages in the current cases. A long history of reckless disregard of health risks to others from a defendant's conduct necessarily is relevant to punitive damages for present conduct. Although the plaintiffs will have to show a close relationship between Mr. DeCoster's involvement with the prior businesses involved in *Salmonella* outbreaks and his involvement with Quality Egg—and may have to show something that "bridges the gap" between misconduct in 1992 and misconduct in 2010—for evidence of these older and more distantly-related incidents to be admissible at trial as more probative than prejudicial, at the pleading stage, the court cannot say that these allegations fail to offer plausible

support for a claim for punitive damages. Thus, Quality Egg is not entitled to dismissal of the plaintiffs' punitive damages claims on Rule 12(b)(6) grounds.

Similarly, none of the allegations of "category one" incidents or "category two" incidents should be stricken from the December 7, 2010, Amended Complaints pursuant to Rule 12(f). Even if these allegations are not "strictly relevant" to the underlying claims at issue, they need not be stricken, because they provide "important context and background" to the claims asserted and are relevant to some object of the plaintiffs' suits, that is, punitive damages. *Stanbury,* 221 F.3d at 1063. In light of the court's considerable discretion under Rule 12(f), the court finds that these allegations do not warrant the "extreme" and "disfavored" measure of striking them under Rule 12(f). *Id.*

## III. CONCLUSION

Because Quality Egg withdraws parts of its Rule 12 Motions, in light of omission or repleading of challenged claims in the plaintiffs' December 7, 2010, Amended Complaints, those parts of Quality Egg's Rule 12 Motions will be denied as moot. Contrary to Quality Egg's remaining contentions, the court concludes that the claims for punitive damages, as amended in the plaintiffs' December 7, 2010, Amended Complaints, do not fail to state claims upon which relief can be granted, nor are some of the allegations supporting the claims for punitive damages so immaterial or impertinent that they should be stricken.

THEREFORE,

1. Quality Egg's Rule 12 Motions, filed in these cases between November 1, 2010, and November 18, 2010, are **denied as moot**

    a. as to Quality Egg's Rule 12(b)(6) motions to dismiss the warranty claims in the *Holt*, *Sands*, *Bussey*, *Dzinovic*, and *Tucker*; and

      b.     as to Quality Egg's Rule 12(e) motions for a more definite statement of the negligence *per se* claims in each case.

2.     Quality Egg's Rule 12 Motions, filed in these cases between November 1, 2010, and November 18, 2010, are **denied**

      a.     as to Quality Egg's Rule 12(b)(6) motions to dismiss claims for punitive damages; and

      b.     as to Quality Egg's Rule 12(f) motions to strike allegations in support of claims for punitive damages.

**IT IS SO ORDERED.**

**DATED** this 25th day of March, 2011.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA